Good morning, Your Honors. May it please the Court, my name is J.T. Williams. I'm representing Little Man in the Boat this morning. I know the Court has the briefs and has read the briefs, so I really want to focus on three points that are key. I just want to bring these out from briefs. The first point is that buying a boat is not the same as buying a car. Or maybe an even better way to put it in this case, selling this yacht is not the same as selling a used car, and particularly selling a used car over the Internet 10 years ago. Now, counsel, though, this case really gets down to whether there was actually a contract, right? And whether it's a boat, a car, a house, piece of bubble gum. A contract is a contract is a contract, right? You need an offer, an acceptance, and then consideration, right? Yes. But before we even go there, the district court found it didn't have personal jurisdiction over the seller because it found that there were not sufficient minimum contacts. So let's go past the personal jurisdiction issue because you've got a pending case filed in Washington, right, that's state at this point. So let's move past personal jurisdiction and get to the contract issue. You've got an offer, and the hang-up is the acceptance. So where are you finding acceptance? Well, so the offer is the offer that was made by Kevin Stigall on the morning of December 31st, which was in a phone call when he said to Mr. Murray, $12,500, and this is our counteroffer, $12,500, and deposit $1250 of it, the 10% wire transfer, as early as 5 o'clock p.m. today. Mr. Murray said, great, I'm down for it. And Kevin Stigall said, we've got a deal. That's what is alleged in the complaint. Well, actually, what was alleged was, we'll see, right? Not, we've got a deal. No, Your Honor. We'll see. On page 341, no, I'm sorry, 344, 344 of the record, which is the First Amendment complaint, JJJJ, that's four J's, says that on the morning of December 31st, 2015, Kevin Stigall presented a counteroffer to purchase the vehicle in the amount of $12,500, which would be followed up by a written counteroffer. Murray accepted the counteroffer of $12,500. Then the written counteroffer was sent, and Murray accepted that by signing it and by sending it back. Now, in the Applebee's brief, they certainly argue that this blatantly mischaracterizes the conversations, but that's a question of fact. We're supposed to, at this stage, we're supposed to take the allegations of the complaint as true. And notably, nowhere in the Applebee's brief do they contest that Kevin Stigall made this counteroffer and said, here's the counteroffer, and Murray accepted the deal. At that point, we have an offer and we have an acceptance. Hold on. I'm trying to catch up to you here. So what was sent back, so what was attached, right, is the written counteroffer. All right. So there was a form that was attached, right? There was a written form that was attached to the written counteroffer, yes. Okay. And I will absolutely, there is ambiguity in that email that is sent. I agree. And if all we were looking at was that email, if that was the only thing we had, then that would raise some questions. But here it's not the only thing we have. What we have is the representation in the complaint that on the phone, Kevin Stigall said, we've got a deal. And at that point, we've got a deal. And if he later sends over some written form, I mean, this is the battle of the forms. California is very clear in contract law that the parole evidence rule does not bar evidence that shows that what might appear to be an ambiguous term is, in fact, ambiguous. And here we have, we've got a deal from Kevin Stigall. Who knows what happened. I suspect probably after he got off the phone, he realized he'd better cover himself a little better. Maybe he talked to the seller and they said, you know, hey, we've got this other party that might be interested. We need to get a little more wiggle room. But it's too late. He had already said, we've got a deal. And the evidence for that is very clear because Mr. Murray immediately wires the money. If you look at Mr. Murray's first offer, that first offer very clearly says that the money would be paid in checks, excuse me, in checks that would be sent over after everything was done. They say, no, we want the money right now. Murray says, okay, if that's what you want, I'll send over the money right now. That is showing his acceptance of their offer. But the statute of frauds comes into play here, right? Yes. And it requires, in a sale of this amount, a written contract. It does. But Banner Entertainment and California law has been clear that if the parties have already made an agreement and it's understood that that agreement is supposed to be binding, the fact that we haven't both gotten around to signing the paperwork yet is not a bar. And that's what we have here. We have, we've got a deal. I'm going to send over our form. I'm sorry. The point of having a statute of frauds, if you don't need anything in writing, you can just say we've got a deal. The point of having a statute of frauds is to make sure that we know what the specific terms of the contract are. But the statute of frauds is supposed to prevent fraud both ways. Here, what they're trying to say is, they made a deal, they said we've got a deal, you sign it, he signs paperwork, send it back. And then they say, oh, well, wait a minute. Now we're going to hold off a little bit. And are we, are we're not going to say, I mean, that's, that's the fraud that's being perpetrated here. Ultimately, they told him, we've got a deal. If you'll deposit the money, and if you'll sign the paperwork and send it back, that's what you need to do. He did that. In fact, they wrote back and they said, hey, actually, we need the money right now. Oh, and you missed one space. Can you initial here? He did that. What you have here is you have an exception. He performs. Then they turn around later and say, oh, no, actually, there was something else that, you know, we didn't do. Sotomayor, did you spend a few minutes on jurisdiction? Yes, please. On jurisdiction, I'd like to draw the Court's attention to excerpts of record pages 99 through 102. 99 through 102. These are the exhibits to the Declaration of Independence. This is what the appellee brief describes as one-sided communication. And that they use that phrase all the time. They say, oh, there was just one-sided communication. Look at these pages, 99 through 102. We have authors of Christine Blevio, Scott McNally, Larry Rose, Randy Chase, Kevin Stegall, Rob Tolf, Lisa Dintinger, George Davis. All of these are people from the seller or from the broker who initiated communications directly with California. And what's interesting, Your Honor, if you look at page 185 in the record, this is the e-mail where they're discussing. It's from Kevin Stegall, and he's forwarding an e-mail where they refer to Mr. Murray as the buyer down in San Francisco. That's actually how they think of him, the buyer down in San Francisco. They knew every time that this was a buyer in California. And moreover, if you look at the e-mails, particularly from Rob Tolf and from George Davis, those are... I'm sorry. I'm sorry. These communications on page 99 through 102, they concern different transactions? No. This is all, this is this transaction. They're just two different people. Right. These are different people. But why does one transaction provide sufficient context? Because this transaction was negotiated over the course of over five months. And if you look particularly... So what? So you have, the key is, are there minimal contacts? Is there purposeful direction toward California? And one of the important ones to note are these e-mails... The fact that this was on a website doesn't count, right? That's right. That's right. What counts is, especially, for instance... I mean, the question is whether you reach out to California. Yes. And when Mr. Murray says, you know, the seller doesn't seem like they're particularly interested, then he suddenly gets an e-mail from Kevin Stegall that says, hey, Larry, it's been a while since I've heard from you. Are you still interested in the boat? Then we get the e-mail from Rob Tolf that says, your file just hit my desk. Hey, are you still interested? Then we get an e-mail, two e-mails from George Davis, and those are e-mails where George Davis says, hey, this is a great time to buy a boat. There's an e-mail from Kevin Stegall that says, hey, by the way, the seller just dropped his price. What actually happened is they know they've got... Communications all to the same person? But they're solicitations. They're directed specifically to a buyer they know is in California, and that matters because this boat... There's a reason they're not selling it to someone in Kansas. They're selling it to the buyer down in San Francisco because this is someone who actually... This is a practical place. They hadn't had an offer in seven or eight years, and now they have somebody who actually is interested, and you get communications from 10 different people reaching out to, initiating... Is there any authority that communication on a single transaction are enough to The authorities say that contract negotiations are exactly the kind of thing. The authorities say if it's just a one-time transaction, if it's just an isolated sale, then that's not enough. The authorities say we look to see whether they're random... How many boats were they trying to sell? One boat. Yeah. Yes. But these are not random, fortuitous, attenuated contacts. That's the point that we'd make. Okay. Okay. You're out of time. Thank you. Thank you, Your Honor. Good morning, Your Honors, Counsel. I may please the Court. Catherine Malone on behalf of Respondent Octoshaw Discovery. I'll call them ATS for everyone's convenience today. We're here today to answer a simple, simple question. Can an isolated transaction for the one-off sale of a boat initiated by a California resident force an Alaska company to litigate in California simply because the would-be purchaser happened to reside here? The answer, Your Honors, is no. And for this reason, this Court should affirm the District Court's order dismissing this case. To do otherwise overturns the clear authority and ignores fundamental principles of due such as ATS from being dragged into foreign courts without fair warning and subjected to the binding judgment of a forum with which it has established no meaningful contact. The appellant would have you believe that answering a handful of emails and a few phone calls about this item for sale somehow changes the analysis. It does not. The appellant would also have you believe that using a licensed broker also somehow changes this analysis. It does not. Uh, at the end of the day, this was a one-off sale of a single boat that didn't create any substantial connections to California or the appellant. And that's all there is. Would it make a difference if they showed that they really wanted to sell this to somebody in California? If the emails showed that, yes, Your Honor, I believe so. If there was an intention to sell the boat to someone in California. Because they were in California. Yes. But the emails that we have don't show that. Nor does the activity by the broker or ATS. Broker was in, broker in Florida, is that? Yes. Yes, Your Honor. They're based in Florida. And what was the, what communications were there between the broker and the buyer? Uh, I believe there's the entire record of it is, um, in front of you. There, what happened was the boat was posted, um, for sale on this globally accessible, passive website. Uh, it was merely advertised. The website itself doesn't, you know, conduct or facilitate transactions in any way. And then the appellant admits that it came across this listing and then initiated contact with the broker. And the broker actually didn't even believe that it was licensed to sell the boat in California initially and wanted to check. These are not the actions of a party that is intentionally directing its activities towards California. Um, the. And the boat was in Washington? Yes, Your Honor. The boat was in Washington. And under the contract, it was to change hands in Washington. So the contract, had it been accepted, and it was not, uh, would have envisioned performance 800 miles away from here. And just to go back to the terms of the contract, um, as you, Your Honor's noted earlier, there was no acceptance. And had there been acceptance, it would have been accepted in Alaska under the terms of the contract. So the contract wouldn't have been formed in California. It wouldn't have been performed in, wouldn't have been formed in California. It wouldn't have been performed here. And there were no negotiations that took place in California, except purely by the appellant. That's not enough. Um, you know, the focus on the number of emails and calls is a red herring. The analysis here is qualitative, not quantitative. What about the, going to the, whether or not there was a contract, what about the argument that, uh, they said that we have a deal? Well, Your Honor, the emails very clearly show that the appellant was understood very clearly that there was no deal until it had been signed. In fact, the email, uh, that attached the signed contract, the document that appellant contends, uh, contained its acceptance, noted specifically that the appellant was aware that the contract wasn't accepted and there was no deal until it was signed and returned to the broker by 5 p.m. on December 31st, 2015. And since that wasn't happening, that's... Their claim is that by then it was too late because he'd said there was a deal. That's the claim. Yes, Your Honor. But there was no deal and that was... And in fact, in the record at, um, 540, there's an email, um, to Mr. Murray that says, um, working on the... Working on details with seller might have a deal. Can you wire full funds into escrow within the hour if need be? And then please initial the last page of Exhibit A. I see you missed this. Exactly. The email that, uh, the appellant is speaking of was clearly an invitation to make an offer. And it was clear that the, uh, respondent, ATS, wanted to sell the boat by the end of the year. But the email from Kevin Stegall clearly notices and points out the existence of an external condition precedent. It says, if this other deal falls through, then we might have a deal. And since that deal never fell through, that is, in fact, where the boat is, uh, today, there... The terms and the possibility, um, of this contract ever coming into existence never happened. And so, I just... All of the admissions made by appellant established that there was no personal jurisdiction here and that there was no contract to breach because there was no acceptance. It would have been a pretty good deal. Right? Wire. Yeah. Yeah. Um... Thank you. Sorry? Thank you. Thank you. Thank you. Respondent submits. We'll give you a minute for rebuttal. I... I really just want to make two quick points on rebuttal. One is that we're not focusing on the number of emails for jurisdiction. We're focusing on the quality and the direction of the emails for jurisdiction. And I think it's particularly important that you have unsolicited offers where he had expressed interest in the past, but months later, George Davis says, hey, look at this boat. Are you interested? Those are emails that are directed from the seller into California. That right there is probably enough to give jurisdiction. Also, quickly on the Luberski case, the court's reasoning there, it's not that the contract was being performed, the oil was coming to California. It's that therefore the seller knew that the oil was being placed into commerce in California. That's something similar here. The other thing I wanted to point out, the if condition that Judge Ellis raised, this is the one way that buying a boat might be like buying a used car. There's always another offer. And that's how Mr. Murray understood that, is, look, you better act really fast. We've got this other body that, you know, might want to buy it. So he acts very quickly to show the acceptance to do everything because he thinks he's got a deal. And that's what he's doing all along. But the last email in this chain says, Kevin, I'm looking to find out if the deal is done or if it's dead. Please give me a call or send a copy of the signed contract along with a notarized bill of sale. Thank you, Larry Murray. And he's wanting to know what the status of the sale was. Right. Because he's worried that they're trying to back out of a contract now. Mr. Murray is an attorney. He knows when he said, we've got a deal, we've got a deal. He was ecstatic. He can tell you the intersection he was at that day when they said, we've got a deal. If he's an attorney, then certainly he should know that this transaction is covered by the statute of frauds. And if there's nothing written and he has nothing signed by the seller, he doesn't have a deal. But Banner Entertainment says that if the parties have manifested their intent to be reduced to writing yet, doesn't necessarily kill it under statute of frauds. And that's a jury question. But it was never reduced to writing. Not reduced to writing yet. Right. But that's. It was never reduced. But that's what Banner is all about. If the party, the fact that that's why it was breached. The party's breached. Banner doesn't say, oh, well, what Banner says is even if you don't reduce it to writing, if you already intended to and you express that you intended to, then if a party tries to back out, that's what Banner covers. Counsel, what is the point in the statute of frauds? The point of the statute of frauds is that we're supposed to know what the terms and we know that there's a binding contract. But there are some exceptions to prevent fraud. And that's what's happening here. We had a deal. We have a deal. And then the seller tries to back out later. The statute of frauds doesn't protect that. Okay. Thank you. Thank you. Thank you, Your Honors. Kajal Sagi will stand submitted.
judges: Schroeder, Kozinski, Ellis